UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

William VanHoudt,

Plaintiff,

vs.                                                          REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

Defendant.                    Civ. No. 05-109 (DSD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which denied his application for Disability Insurance Benefits ("DIB"),

and Supplementary Security Income ("SSI").  The matter is now before the Court

upon the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared

by Philip R. Reitan, Esq., and the Defendant has appeared by Lonnie F. Bryan,

Assistant United States Attorney.  For reasons which follow, we recommend that the

Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff applied for DIB on January 2, 2003, and SSI on May 22, 2003, at which times, he alleged that he had become disabled in March of 2002. [T. 68-70, 247-50]. His claims were denied upon initial review, and upon reconsideration. [T. 31-50]. The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on January 9, 2004, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel. [T. 20]. Thereafter, on May 21, 2004, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 20-30]. The Plaintiff requested an Administrative Review before the Appeals Council which, on December 23, 2004, declined to review the matter further. [T. 7-9]. Thus, the ALJ's determination became the final decision of the Commissioner. Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

## III. Administrative Record

A.   Factual Background. At the time of the ALJ's decision, the Plaintiff was fifty-two (52) years old, and was a high school graduate with training as a machine

operator.  [T. 85, 90, 93, 105, 276].  The Plaintiff alleges that he cannot work due to his shoulder problems, and the lack of upper body strength.  [T. 84].

       1.    <u>Plaintiff's Physical Impairments</u>.  On March 27, 2001, the Plaintiff was seen for a follow-up evaluation on his right shoulder rotator cuff.  [T. 129].  The physical examination revealed that the Plaintiff was able to flex his shoulder, albeit with some limited range of motion, but appeared "without complaint."  <u>Id.</u>

On July 3, 2002, the Plaintiff met with Dr. Marilyn K. Waldschmidt.  [T. 127].  Dr. Waldschmidt noted that the Plaintiff had passed out on June 18, 2002, and was hospitalized after "[h]e was outside pulling weeds on a fairly warm day."  <u>Id.</u>  His blood pressure medication was subsequently decreased.

On August 16, 2002, the Plaintiff was seen, at the Waseca Medical Center, by Dr. Jasper Daube.  [T. 147-51].  At that examination, the Plaintiff reported a number of past seizures, and advised that he was taking Dilantin.[1]  Dr. Daube noted that the Plaintiff had "very poor constructional abilities, [and the] inability to copy a cube," but that the neurovascular exam was unremarkable. [T. 148].  Dr. Daube wrote, in part:

---

[1]Dilantin is indicated for the control of generalized tonic-clonic (grand mal) and complex partial (psychomotor, temporal lobe) seizures.  <u>Physicians' Desk Reference</u>, at 2531 (57th Ed. 2003).

[The] [m]otor exam was noted for prominent weakness of the rotator cuff musculature in the right upper extremity consistent with his old injury in this region.  Additionally, the patient had marked weakness of his triceps muscle consistent with his past history of a C7 radiculopathy as diagnosed by EMG.  Additionally, the patient had some mild weakness in his more distal musculature including some digit extensor and interossei weakness.  Tight lower extremity did reveal some mild weakness in hip flexors and perhaps some asymmetry in his hamstrings on the right as well.

\* \* \*

[The Plaintiff] appears to be suffering from some moderate cognitive impairment primarily focused on a visual spacial as well as memory retrieval skills.  This is likely secondary to his long-standing history of alcohol use and abuse and should be followed over time.

\* \* \*

It is felt at this time that Mr. VanHoudt should continue his Dilantin medication at its present level while we recheck a level today.  It is unclear if this patient is compliant with his medications, although he states that he is.  We will recheck the Dilantin medication today and make further adjustments to this medication on the basis of the laboratory value.   Mr. VanHoudt's low Dilantin level is likely to result from either poor compliance or up regulation of the cytochrome P4-50 system.

\* \* \*

> The [Plaintiff] does still exhibit signs of this old C7 radiculopathy, additionally complicated by his rotator cuff injury on that side.  At present there is no intervention for this as the symptoms appear to be stabilized clinically.

[T. 148-49].

On August 21, 2002, the Plaintiff underwent an EEG study, which returned normal results, in order to address his recurrent history of seizures. [T. 152, 159].   An additional CT scan indicated no intracranial abnormalities. [T. 159].  Dr. Daube's final diagnosis was that the Plaintiff suffered from grand mal seizures that were idiopathic and alcohol-related.  Id.

On September 5, 2002, the Plaintiff sought treatment at the Bell Hill Recovery Center for alcohol abuse, and to "get away from his situation."  [T. 156-58, 160-62]. On the admission intake form, the Plaintiff reported "no joint pain, stiffness, arthritis, gout, or backache [and] [n]o muscle pains or cramps."  [T. 157].  At a subsequent physical examination, the Plaintiff was found to have a, "[l]imited range of motion of the right shoulder secondary to rotator cuff injury," and "good strength in hands, wrists, elbows, and shoulders." [T. 158].  The Plaintiff also reported numbness in his fingers that was "secondary to [the] neck and rotator cuff injuries."  Id.

On September 26, 2002, the Plaintiff reported right shoulder pain and soreness, with a limited range of motion.  [T. 160].  The Plaintiff was sent for an x-ray of his

right shoulder.  The Plaintiff also reported that he was taking ibuprofen, and was performing physical therapy.  On October 31, 2002, the Plaintiff was referred to an orthopedic specialist, after a review of the right shoulder MRI.  The Plaintiff continued to report problems, including a limited range of motion, tenderness, and pain.  [T. 162].  A review of the MRI revealed a "massive irreparable cuff tear now with biceps symptoms in addition to his cuff arthropathy."  [T. 166-68, 206].  The Plaintiff was referred for additional physical therapy.  [T. 206].

On December 10, 2002, Dr. Waldschmidt met with the Plaintiff for a medication check-up.  [T. 125].  At that meeting, the Plaintiff reported that he was "feeling fairly good."  Id.

On December 11, 2002, the Plaintiff met with Dr. Daniel Buss.  Dr. Buss noted that a physical examination of the Plaintiff indicated a restricted range of motion, and limited strength in the right shoulder.  Dr. Buss also noted that "[the Plaintiff] is starting to get impingement type symptoms in his left shoulder and has some weakness and anterior cuff tenderness there that may need further surgical treatment in the future."  [T. 219].  Dr. Buss opined that the Plaintiff "probably would qualify for Social Security Disability given his alcoholism as well as his badly dysfunctional right rotator cuff."  Id.

On February 3, 2003, State Agency physicians reviewed the medical evidence which related to the Plaintiff's physical condition, and concluded that the Plaintiff could occasionally lift twenty (20) pounds on the right side, and fifty (50) pounds on the left side; and frequently lift ten (10) pounds on the right side, and twenty-five (25) pounds on the left side. [T. 197]. The State Agency physicians also concluded that the Plaintiff could sit, stand, and/or walk, for about six (6) hours in an eight (8) hour work day. The State Agency physicians observed that the Plaintiff was precluded from reaching areas above his shoulders, as the Plaintiff suffered a reduced range of motion resulting from a torn right rotator cuff. They felt, however, that "push pull activities are still possible for both upper extremities, but below shoulder level for the right side." Id.

In July of 2003, the Plaintiff was seen at the Mayo Clinic for complaints of dizziness, head stuffiness, monocular dyplopia, and double vision. [T. 238, 245]. The Plaintiff denied any alcohol use for several years. [T. 244]. The Plaintiff was told that he had cataracts that were not yet ready for repair. He was also told that the tests on his "head fullness" did not reveal any serious problems, and that he would need to learn to live with those symptoms. [T. 240]. His Dilantin dosage was also increased.

In October of 2003, the Plaintiff complained of right knee pain.  The Plaintiff reportedly took ibuprofen, which appeared to help.  The x-rays demonstrated "early arthritis with joint space narrowing of the medial compartment."  [T. 204].  The doctors recommended conservative treatment measures, and advised it was, "quite likely that his knee symptoms will wax and wane over time" but, "[i]f he is unlucky and his symptoms worsen, of course, there are other treatments possible such as injection or surgery, but those do not seem necessary at this point."  [T. 205].  The Plaintiff received a steroid injection for pain in his right knee on November 20, 2003. [T. 225].

2.      Plaintiff's Mental Impairments.  In January of 2003, the Plaintiff completed an "Activities of Daily Living Questionnaire."  [T. 99].  The Plaintiff reported that he spent his time attending AA or NA meetings, reading, talking to people, playing cards, and, "going places for walks."  [T. 100].  He had gotten along "with all people," and did well in groups and had no fear of going out in public or with groups.  [T. 100-01].  He also reported that he would cook, clean the house, read, fix things, participate in clubs, play cards, visit with friends, and engage in volunteer and exercise activities, on a daily basis. [T. 102].

In February of 2003, the Plaintiff was referred by the State disability determination agency to Dr. Daniel Carlson, a psychologist, for a consultive

evaluation.  [T. 174].  The Plaintiff reported to Dr. Carlson that he had experienced depression off and on for many years, and was taking antidepressant medication for approximately three to four years.  Id.  The Plaintiff also reported that, when he became depressed, he would feel worthless, experience suicidal thoughts, sleep poorly, and have a low energy level.

As to the Plaintiff's level of daily functioning, the Plaintiff reported:

> [H]e spends his time playing cards, watching television, reading self-help books, writing letters, and listening to music.  He said he enjoys the Rochester Public Library. Mr. VanHoudt engages in shopping independently.
>
> *    *    *
>
> Mr. VanHoudt said his concentration and persistence with daily tasks are fairly good.  Mr. VanHoudt denied having any difficulties getting along with others.  He interacted adequately with me.

[T. 175].

Dr. Carlson's summary, and recommendations. consisted of the following:

> Mr. VanHoudt's ability to understand, remember, and follow instructions does not seem to be significantly impaired, provided they are within his mental and physical ability levels.  His attention and concentration seem adequate.  Mr. VanHoudt's ability to perform work tasks with adequate persistence and pace would depend on the difficulty of the tasks.  A medical opinion would be necessary to speak to the impact that Mr. VanHoudt's

> shoulder problems have on his ability to work.   Mr.
> VanHoudt's ability to respond appropriately to brief
> contact with coworkers and supervisors seems adequate.
> His ability to tolerate the stress of an entry level job seems
> fine with regard to his psychological functioning; he
> emphasized that one of the main reasons he is depressed is
> because he is unemployed and has too much spare time.
> Mr. VanHoudt seems capable of managing financial
> resources in his best interest.

[T. 176].

Dr. Carlson diagnosed the Plaintiff with alcohol dependence, in early full remission;

and major depressive disorder, recurrent and moderate; and also assigned the Plaintiff

a Global Assessment of Functioning score of 65.[2] Id.

Drs. Thomas Kuhlman, and James M. Alsdorf, who are State Agency

psychologists, reviewed the available medical evidence, in February of 2003, and

concluded that the Plaintiff's impairments moderately limited his abilities to:

---

[2]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On the 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. Id.

understand, remember, and carry out detailed instructions; complete a normal workday; interact appropriately with the general public and his supervisors; and respond appropriately to changes in the work setting or set realistic goals. [T. 192-93]. He was able to concentrate on, remember, carry out, and understand, routine repetitive tasks that involved three (3) and four (4) step uncomplicated instructions; he possessed adequate ability to interact with coworkers, and the public, for brief and superficial contact; and could adequately handle the stresses of routine, repetitive work. [T. 194].

B.    <u>Hearing Testimony</u>. The Hearing on February 9, 2004, commenced with some opening remarks from the ALJ. [T. 270-72]. The Plaintiff's attorney did not object to any of the evidence in the Record, and did not have any additional documents to add to the Record. [T. 271]. After the Plaintiff's attorney delivered an opening statement, the ALJ began questioning the Plaintiff. [T. 272-73].

The Plaintiff testified that he was right-handed, he was five (5) feet, six (6) inches tall, and he weighed approximately 240 pounds. [T. 273]. The Plaintiff was not married, and had last divorced in 1995. [T. 273-74]. He testified that he had lived in multiple group homes, and had also taken a job, as a caretaker, in Mankato to receive room and board. [T. 274]. The Plaintiff stated that, after having worked for two (2)

months as a caretaker, "things weren't right[, and] I went out I got drunk and we separated ways." Id.

The Plaintiff testified that he had a valid drivers license, but did not own a car or drive to the Hearing. [T. 275-76]. He also related that he graduated from high school, and was certified as a firefighter. [T. 276]. He continued to smoke a "half a pack to a pack" of cigarettes over the last few years, but had not consumed any alcohol since October of 2003, and had not consumed alcohol on a regular basis after he completed his treatment for alcohol abuse. [T. 276-77].

The Plaintiff stated that he lived at a group home because:

> I can't work. I've tried. I have no motivation. I wake up in the morning and it feels like I have a headache but I don't have a headache. My neck is sore, my arms are sore, my legs are sore. I fight sleep every night. I'm not on any medication as of yet."

[T. 278].

The Plaintiff surmised that the pain was the source of his difficulty in sleeping. Id. He also stated that his medications caused him to be fatigued throughout the day, and that he would often require daily naps. He also stated that he wished to obtain sleep medication, but that he lacked sufficient income, from general assistance, to pay for it. [T. 278-79].

The ALJ then inquired about the Plaintiff's medical condition.  [T. 279].  In response, the Plaintiff stated that he had experienced daily problems with his right shoulder, and that "I can't lift from the side," and "I can't get anything out of the refrigerator that's higher up."  Id.  The Plaintiff testified that he attended physical therapy sessions, but that there was no change.  When asked by the ALJ, the Plaintiff stated that, if he did not raise his arm, he would not experience any pain.  [T. 279-80].  He also added that, if he would "lay on that side, in the morning I can't hardly move it."  [T. 280].

The Plaintiff also testified:

> My left shoulder's been just as stiff as that one but the shoulder specialist that I talked to in Waverly he said no matter what you do, don't let anybody touch your shoulders anymore.  He says your right one is gone and your left one is just as bad as your left one  -- or your right one was.

Id.

The ALJ then asked the Plaintiff about his seizures.  He replied that the last time that he had experienced a seizure was in 2002.   Id.  The ALJ noted that the Record reflected that the seizures were brought on by the use of alcohol.  The Plaintiff also stated that he had experienced a seizure while he was sober, but had remained seizure-free since he had taken his prescribed medication.  [T. 280-81].

The ALJ turned his scope of inquiry to the Plaintiff's claims of depression. The Plaintiff testified that he continued to take antidepressants, but that they were still not enough. [T. 281]. The Plaintiff explained that:

> Because of my condition, I mean, and what I'm limited to do with myself. It's kind of depressing for a person that -- before I was ever an alcoholic, I was a workaholic. I mean, one of the first things I do every day is to read the want ads to see if there's a job there that I could find one and I call and they just don't want anything to do with me. I mean, so you get depressed about that. I get depressed about everything. I get -- I can ride on the bus and I'm riding down the road and I know I've got to get up at the next stop and I -- my legs, I've got to stand there for a minute just to let everything get to work.

[T. 281].

The Plaintiff stated that he had "no idea" what was happening with his legs, but that he could walk for about three (3) blocks before he would have to stop, and rest his lower back and legs. [T. 281]. He added that he experienced lower back pain. [T. 282].

When asked by the ALJ to describe the pain in his legs that would occur after walking more than three blocks, the Plaintiff responded that "they're sore from the knees on down;" "[I] mean, both of them." Id. Upon further questioning by the ALJ, the Plaintiff stated:

> I've had them checked and they didn't know.  They come
> with a needle and that helped my knee, the shot of cortisone
> or whatever they put in there.  But as far as my lower legs,
> that's where the pain is.  It's constant.  I walk around --
> from one to ten, I'm in seven all the time.  But when I walk
> like those three blocks, I stop because it's up to ten then,
> And my back and legs just -- I've got to rest.

Id.

The Plaintiff added that he had experienced the leg pain for the last two (2) years.  The

ALJ then asked him if a doctor had diagnosed the problem in his legs.  The Plaintiff

responded that, "not my lower legs," as he had been "to specialists here in Mankato,

but I don't remember what year it was because my lower leg was all black and blue

and they were afraid I was going to have a blood clot."  Id.

The ALJ then asked the Plaintiff if he could lift fifty (50) pounds now. [T. 283].

The Plaintiff responded that, "[i]f I would, it would be from the floor to my waist and

that's it."  Id.  The Plaintiff also confirmed that he had a seizure in July of 2002, and

that all of his EEGs were negative.

The Plaintiff testified that he had to leave his work, as a machinist, in February

of 2003, because of difficulty with his shoulder problems.  Id.  The Plaintiff disputed

the accuracy of the September of 2002 report, which noted that the Plaintiff was

-15-

unemployed because of seizures, as he had to quit because of "both shoulders, and my neck." [T. 284].

The Plaintiff was then questioned by his attorney about his rotator cuff surgery. Id. The Plaintiff testified that he had surgery on his right shoulder, and not on his left. The attorney, and the Plaintiff, then had the following exchange:

Attorney: I know in the October 2003 report of Dr. Farrell it talks about left rotator cuff repair. Is that right rotator cuff repair?

Plaintiff: Right.

Attorney: The doctors have indicated that there's still a massive full-thickness cuff tear that's not repairable. Is that what they told you?

Plaintiff: Um-hum, and it was my triceps, too.

Attorney: And are you right-handed.

Plaintiff: No.

Attorney: You're left-handed?

Plaintiff: I'm not left-handed, no.

Attorney: Are you right handed?

Plaintiff: Yes.

[T. 284-85].

The Plaintiff, upon questioning by his attorney, noted that the pain in his legs was mainly from the knees down, and that he was unsure as to how long he could stand, but he estimated that it would be a half-hour before he would have to find someplace to sit. [T. 285]. The Plaintiff testified that he still took Dilantin for his seizures, Zoloft for his depression, and ibuprofen for pain. [T. 285-86]. The Plaintiff also testified that his antidepressive medication dose was increased, because he was "so mad" at his legs. [T. 286]. He also related that his medications made him tired and unable to finish the tasks that he had embarked upon, which led to an increased state of depression, and a feeling that he lacked the drive to accomplish anything. [T. 286-87].

The ALJ then re-examined the Plaintiff, and specifically inquired about the effectiveness of the antidepressant medication. [T. 287]. The Plaintiff responded that he did not think the medication was working anymore, and that it was time to change his prescription. [T. 288]. The ALJ then asked the Plaintiff if he had discussed this ineffectiveness with his doctors, to which the Plaintiff responded that he had difficulty in affording the doctors, and that they had upped his dosage at his last visit. Id.

The Hearing continued with the testimony of the Medical Expert ("ME"), who confirmed that he had never treated the Plaintiff as a patient, but that he had reviewed all of the available medical evidence. Id. The Plaintiff's attorney had no objection to

-17-

the ME's qualifications.  Id.  The ME was allowed to question the Plaintiff, and asked him about his reported lightheadedness and dizziness.  [T. 289].  The Plaintiff responded that he did not know if those symptoms were related to the Plaintiff's seizure disorder.  The ME also inquired about the Plaintiff's treatment for his neck. The Plaintiff responded that he had the surgery done because his right arm was going numb, and that it did help at the time, but that he was unsure if his neck surgery was related to his other medical problems, and he noted that there had never been a CT scan performed on his neck.  Id.

The ME then listed the Plaintiff's impairments. [T. 290].  The ME noted that there had been a rotator cuff tear, for which there was some confusion in the Record as to whether it was for the left or right shoulder.  Id.  The ME also testified that there was a breakdown that was repaired, and there was a dislocation of a biceps tendon, and that there was some triceps muscle weakness, and loss of range of motion on the shoulder, according to the Record.  Id.

The ME also testified that there was treatment for right knee pain, which the ME believed was osteoarthritis, and a limited range of motion associated with that condition.  Id.  Also, the patient had experienced seizures when the treating medication was not in use, which may be alcohol related.  There was also a history of treatment

-18-

for neck and back pain, which was addressed with surgery in the late 1980s.  The ME also noted some psychiatric disturbances, and major depressive disease, with moderate cognitive impairments.  [T. 291].  The ME concluded that none of those impairments met or equaled the Listings,[3] either individually, or in combination.  Id.

The ME explained his opinion by noting that the patient had no knee deficits, the seizures appeared not to be occurring at the Listing level of frequency, and the cervical spine surgery, that was performed in the 1980s, appeared to be reasonably successful.  [T. 291].  The ME refused to comment on the psychiatric impairments. Id.

Based upon those impairments -- namely, the ongoing shoulder problems --  the ME would restrict the Plaintiff to sedentary work.  Id.  The ME also would place restrictions upon the Plaintiff in regard to heights or machinery, owing to the potential for the Plaintiff to experience seizures.  [T. 292].  Overhead work was also precluded by the Plaintiff's neck and shoulder problems.

---

[3]20 C.F.R.  §404, Subpart P, Appendix 1, contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

Thereafter, the Hearing continued with the testimony of the Vocational Expert ("VE"), who had reviewed the vocational evidence in the Plaintiff's file, and who was familiar with jobs in the State of Minnesota. [T. 293]. The Plaintiff's attorney had no objection to the VE's qualifications. Upon inquiry, the VE altered her report to reflect that the Plaintiff had no relevant experience as a retail store owner/operator, after the Plaintiff stated that he had not opened his proposed bookstore. [T. 292, 293].

The ALJ then posed a hypothetical to the VE, which asked her to assume a male, from forty-nine (49) to fifty-one (51) years of age, and with the past work experience as set forth in the VE's report. [T. 294]. The ALJ related that the individual was impaired primarily by the ailments disclosed by the ME, including a history of shoulder pain, with a breakdown and repair, and some additional tearing of the biceps tendon, and additional problems in the C7 cervical spine, with right knee pain characterized as osteoarthritis. Id. Furthermore, the hypothetical person had a seizure disorder, which was thought to be alcohol-related and at least one mention of syncope.[4] He also had been diagnosed with major depression, alcohol dependency

---

[4]Syncope is a "temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." Dorland's Illustrated Medical Dictionary, p. 1747 (29th Ed. 2000).

in partial remission at the present time, and mild to moderate cognitive impairments. Id.  The hypothetical person also was limited to a sedentary level of exertion, at least as to lifting; limited to no positions that did not involve heights or machinery; should not have overhead tasks; could not have alcohol on the job site; and would not perform anything more complicated than a three (3) or four (4) step task.  Id.  There was also no limitation, in keeping with the ME's testimony, for "time [spent] on the feet."  Id.

With those limitations in mind, the VE testified that the individual would be unable to perform any of the past jobs which had previously been held by the Plaintiff, and that he would have no transferrable skills. [T. 295].  The ALJ then inquired into the availability of any simple, unskilled jobs, within the region, which could be performed by the hypothetical individual that would be encompassed by the "sedentary," or "light-sedentary," exertional levels, and which would include lifting less than twenty (20) pounds maximum, and ten (10) on the feet.  Id.  The VE testified that there are such jobs in the manufacturing, assembly, production, and packaging areas. [T. 296].

The VE testified that the hypothetical individual would be well suited for work as a bench worker -- a light, unskilled position with 39,000 positions listed in the State

Census, which would have to be halved to account for the sedentary-light limitation. Id. The individual would also be suited as a machine packager -- a light, unskilled position with 16,000 positions in the State Census, and with approximately half of those positions available to the hypothetical person so as not to exceed the ten (10) pound limitation. Id.

The Plaintiff's attorney then questioned the VE as to whether she had limited the positions to sedentary positions that involved no more than three (3) or four (4) steps. The VE responded that she was not limiting him to sedentary, but instead, was limiting the person to a sedentary exertion level as to lifting, but without limitation as to the time spent on the feet. The VE also incorporated limitations to account for the seizures and the cognitive impairments. Id.

The Plaintiff's attorney then asked whether the VE could compare the numbers of sedentary work jobs, to the numbers of jobs available that were classified as light, with a sedentary lifting component, that also included a limitation of three (3) or four (4) steps. [T. 297-300]. The VE could not compare the number of available jobs. [T. 299]. However, the VE stated that the hypothetical person would be listed as performing light work, with a sedentary lifting limitation, as the hypothetical person had no limitation placed upon his ability to be on his feet. [T. 300].

The Plaintiff's attorney then re-questioned the ME about the limitations that he had placed upon the Plaintiff.  Id.  The ME responded that the Plaintiff was limited to lifting weight at a sedentary level, which included no overhead lifting, or lifting to shoulder level.  Id.  The ME also noted the lack of documentation of the neck problems, and observed that the reported knee problems seemed to be "pretty mild." [T. 301].

The Plaintiff's attorney then asked the ME about the Plaintiff's testimony, which indicated that his left shoulder was as bad as his right shoulder.  The attorney asked if the Plaintiff would meet a Listing if both shoulders were found to be equally impaired.  The ME responded, "He might," "[y]es, he might." Id.  The attorney then asked the ALJ to request a consultive exam to determine if both shoulders were equally problematic.  The ALJ and the attorney had the following exchange in regards to the exam request:

ALJ:        Well tell you what I'm going to do about it  --
            focus and make a decision on it.

Attorney:   I   don't   think   the   record   contains
            documentation on the left shoulder.

ALJ:        I don't recall any.

Attorney:   It does, but I think it's a mistake.

ALJ:        Well, I realize that.

Attorney:   And they talk about left shoulder limitations
            but I think when they're talking about that they
            mean right shoulder but I think that the left
            shoulder really is as bad by testimony.  So I
            guess my request is that there be a physical
            exam that would zero in on his left shoulder.

ALJ:        I'll recommend the decision now.  I'm going
            to look at it again and see if I see any reports
            any or anything left side that seem to be in
            conjunction so [INAUDIBLE].   All of this
            prior to testimony.

[T. 302].

The Hearing concluded with the Plaintiff's attorney asking the VE about limitations she

adopted in her hypothetical.  The VE responded that the hypothetical person could

push and pull ten (10) pounds occasionally, with extended reach to the right side, and

that such a limitation further restricts the number of available jobs in the combination

light-sedentary range by ten (10) to fifteen (15) percent.  [T. 302-03].  At that point,

the Hearing concluded with the ALJ stating his intention to get a decision out, and first

try and resolve the attorney's question before proceeding. [T. 303-04].

C.    The ALJ's Decision.  The ALJ issued his decision on May 21, 2004.  [T.

20-30].  As he was required to do, the ALJ applied the sequential, five-step analytical

process that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[5]  As a threshold

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful

activity, since his alleged onset date.  [T. 22].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical

or mental impairments, which would substantially compromise his ability to engage in

work activity.  After considering the Plaintiff's medical history, which included the

---

[5]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearings, the ALJ found that the Plaintiff was severely impaired by a recurrent right rotator cuff tear status post surgical repair, cervical radiculopathy, degenerative joint disease of the right knee, a seizure disorder, alcohol abuse, and depression.  [T. 23].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d) and 416.920(d).  The ALJ determined that the Plaintiff's physical and mental impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Testimony of the ME and the Record.  [T. 23-24].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure.  See, 20 C.F.R. §§404.1520a and 416.920(a).  The four broad areas, which are relevant to the ability to work, are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was subject to a Section 12.04 adjustment disorder in the form of depression, characterized by sleep disturbance, decreased energy, feelings of worthlessness, difficulty concentrating, and thoughts of suicide; and a Section 12.09

substance addiction disorder, currently in partial remission.  [T. 23-24].   The ALJ then

addressed what limitations might result from the Plaintiff's mental impairment.  [T. 24].

With regard to the pertinent factors, the ALJ determined that, because of his

mental impairments, the Plaintiff had "moderate" difficulties in the area of

concentration, persistence, and pace, and "mild" restrictions in his ADL, and social

functioning.  Id.  The ALJ further concluded that the Plaintiff had not experienced any

repeated episodes of decompensation.   Id.   In addition, the ALJ found that the

Plaintiff's mental impairments did not meet, or medically equal, the "C" criteria, as set

forth in Section 12.00 of the Listings.  Id.

The ALJ based that determination on the conclusions of Drs. Kuhlman and

Alsdurf, the report by Dr. Carlson, the records from the Plaintiff's treating physicians,

and the evidence as a whole.  Id.  The ALJ noted that the Plaintiff was able to retain

the mental capacity to advocate for himself, and to seek and successfully complete

treatment for his alcohol addiction.  Id.  The ALJ also commented that, according to

the Record, the Plaintiff reportedly engaged in appropriate daily activities, which

included shopping, visiting the public library, and maintaining his own hygiene --

which, the ALJ noted, was consistent with only a mild restriction in daily living.  Id.

The ALJ acknowledged that the Record showed that the Plaintiff was able to get along with others, and sought out others at AA meetings, in card games, and would talk to others.   The ALJ also noted that the Record showed that the mild cognitive difficulties were linked to depression and alcohol abuse, but that the Plaintiff had reported that his mental ability was sufficient to read self-help books, write letters, shop independently, and manage his own financial resources.

The ALJ then proceeded to determine the Plaintiff's RFC.   [T. 25].   The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§ 404.1529 and 416.929.   After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the reports of Dr. Buss, and Dr. Carlson; the impartial ME; the objective medical evidence; the State Agency consultants,  and the Plaintiff's subjective complaints of pain, the ALJ determined the Plaintiff's RFC to be as follows:

> The [Plaintiff] retains the residual functional capacity to lift and carry 10 pounds occasionally, sit, stand and/or walk in any combination for eight hours per workday with no limits

> to time on feet, that involves no overhead work, no work
> around heights, ladders, or dangerous machinery, no more
> than three to four step tasks, and no alcohol at the
> workplace.

[T. 29].

The ALJ determined that such an RFC was consistent with the weight of the Record,

but was inconsistent with the Plaintiff's assertion that he is disabled from all work

activity by his impairments.  [T. 25].

The ALJ also determined that the Plaintiff's subjective complaints of disabling

pain were inconsistent with the Record.   Id.  The ALJ began by noting that the

Plaintiff, in his application for benefits, only asserted that his shoulder impairment

precluded him from working.   However, at the Hearing, the Plaintiff alluded to

"numerous other conditions [that] preclude him from working," including headaches,

pain in his neck, arms, legs, and back pain that "feels like a chainsaw."  [T. 26].  The

ALJ accommodated the Plaintiff's subjective complaints of pain that were consistent

with the Record, but found that "[m]uch of the [Plaintiff's] subjective testimony is

inconsistent with and unsupported by the medical record and cannot be given great

weight." Id.  The ALJ supported this opinion by noting that there was no evidence in

the Record that the Plaintiff sought treatment for the severe back pain. [T. 27].  The

ALJ also noted that the testimony claiming disabling knee pain, over the last  two (2)

years, was inconsistent with the Plaintiff's subsequent reports to his treating physicians, and the lack of aggressive treatment to address his pain. Specifically, the ALJ noted that the treating physician opined that the pain would "wax and wane," and that no treatment by way of painkillers, or physical therapy, was recommended. Id. The recommended treatment was over-the-counter pain medications. The ALJ also commented on the lack of aggressive pain treatment for the Plaintiff's alleged headaches, and that the medications, which were prescribed for the Plaintiff's seizures and depression, appeared to satisfactorily treat his conditions, as he had reported their helpfulness and had not returned for stronger medication. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC which the ALJ had found, that the Plaintiff could not perform his past relevant work. [T. 28].

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience. Id. The ALJ noted that the Plaintiff was currently 52 years old, which is defined as an individual closely approaching retirement age. Id.; see also, Title 20 C.F.R. §§404.1563, and 416.963. As related by the ALJ,

considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that the Plaintiff could perform work as a benchworker or hand packager, of which there were 24,000 jobs in the regional economy which met the proposed hypothetical.  Id.  The VE also testified that the Plaintiff would need to make only a minimal vocational adjustment, in order to perform those jobs.

The ALJ noted that there was considerable testimony at the Hearing whether the RFC of the Plaintiff was classified in the "light" or "sedentary" exertional category. The ALJ noted that the Plaintiff was limited to the sedentary level of lifting no more than ten (10) pounds occasionally, but had no limitations placed upon the amount of time spent on his feet, which most closely approximated the "light" range of work.  Id. The ALJ noted that the vocational grid rules, which are found in Appendix 2, Subpart P of the Regulations, given the Plaintiff's age, education, past relevant work, and RFC, would provide that the Plaintiff was "disabled" if limited to sedentary work, and "not disabled" if the RFC was limited to light work.  [T. 28].

The ALJ referenced Social Security Ruling 83-12, which addresses the situation where a claimant's exertional level falls between two (2) grid rules which direct opposite conclusions.  Id.  In that situation, in keeping with the Ruling, the ALJ relied on the VE testimony, who concluded that the hypothetical individual, with the

Plaintiff's vocational and RFC, could perform the aforementioned jobs. [T. 29].

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's

age, educational background, and RFC, the ALJ concluded that the Plaintiff was not

disabled, and therefore, was not entitled to a period of disability, or DIB. [T. 29-30].

IV.   Discussion

A.      Standard of Review.   The Commissioner's decision must be affirmed

if it conforms to the law and is supported by substantial evidence on the Record as

a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413

F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).   This standard of review is more

than a mere search for the existence of evidence supporting the Commissioner's

decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).   Rather, the substantiality of

the evidence must take into account whatever fairly detracts from its weight, see, Cox

v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra

at 721, and the notable distinction between "substantial evidence," and "substantial

evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143

F.3d 1134, 1136 (8th Cir. 1998).   On review, a Court must take into consideration the

weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  <u>Banks v. Massanari</u>, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" <u>Vandenboom v. Barnhart</u>, 412 F.3d 924, 927 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the

Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.     Legal Analysis. In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.     The ALJ Did Not Adequately Develop the Record in Failing to Order the Requested Consultive Exam of the Plaintiff's Left Shoulder.

2.     The ALJ Improperly Discounted the Testimony of the Plaintiff.

3.     The ALJ's Assessment of Functional Limitations in the Hypothetical to the Vocational Expert was Unsupported by Substantial Evidence.

4.     The ALJ Failed to Properly Apply the Vocational Guidelines in Making a Finding of Disability.

We address each contention in turn.

1.     Whether the ALJ Adequately Developed the Record. The Plaintiff contends that the ALJ should have ordered further testing and/or a consultative examination on the Plaintiff's left shoulder, based on the Plaintiff's testimony at the Hearing, and some possible confusion in the Record as to the status of the left shoulder vis-a-vis the right shoulder. The Plaintiff contends, based on the ME's testimony, that the Plaintiff "might" qualify as disabled if both shoulders were shown

to be similarly impaired, and that, therefore, such a test is necessary.  The Plaintiff also argues that his request for a consultive examination was never expressly denied by the ALJ.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  The duty of the ALJ is applicable, even where, as here, an individual is represented by counsel.  Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003).  However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).  "'[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Warburton v. Apfel, 188 F.3d1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

We find that the ALJ had ample evidence, in the Record, to support his finding that the Plaintiff did not suffer from a severe impairment, caused by any left shoulder pain.  The ALJ correctly noted that the Record contained some reference to the

Plaintiff's claimed left shoulder ailments.  For example, Dr. Buss noted some "left shoulder impingement-type symptoms with weakness and tenderness over the anterior rotator cuff" in December of 2002, but also noted that it "may require surgical treatment in the future."  [T. 22, 219].  However, there is no mention of left shoulder pain in subsequent visits to various physicians, at which time, the Plaintiff complained of multiple other ailments.  [T. 204-05, 229, 231, 238, 245].  The Record also references a "left rotator cuff repair" on October 30, 2003.  [T. 229].  However, that same reported surgical history fails to record the historical fact of the right rotator cuff repair, that was reported continuously throughout the Record.  [T. 129, 149, 157, 160, 167].  Furthermore, the Plaintiff's own testimony, as adduced at the Hearing, establishes that the rotator cuff surgery was on the right, and not on the left shoulder.  [T. 284].  Finally, the Plaintiff's counsel, at the Hearing, stated:  "I don't think the Record contains documentation on the left shoulder * * * [i]t does, but I think that's a mistake."  [T. 302].

We recognize that the Record contains reports, by the Plaintiff, of "bilateral" shoulder pain.  [T. 207].  Nevertheless, the Plaintiff did not draw any additional medical evidence, to support the same degree of limitation in the left shoulder, as in the right, and, in any event, the ALJ's RFC was not limited to the Plaintiff's right

upper body.  Under the ALJ's RFC, the Plaintiff was limited to lifting no more than ten (10) pounds occasionally, without restricting that limitation to the Plaintiff's right shoulder, thereby implicitly accommodating any suggestion that the left shoulder was as severely impaired as the right.  As the Plaintiff was limited to a "sedentary" exertion level of lifting objects with the use of either arm, any examination on the left shoulder would, therefore, be unnecessary and would not warrant a different result.  In sum, given the weight of the Record as a whole, we find that the lack of subsequent reports of left shoulder pain, to the Plaintiff's treating physicians, did not require the ALJ to order a consultative examination.

Therefore, under the circumstances presented, it was unnecessary for the ALJ to order tests, or a consultative examination, for the Plaintiff's left shoulder.  The ALJ appropriately considered the Record, as a whole, and his determination was well-supported by the Record, without the need for additional development.  Accordingly, we find no error in this respect that would warrant a reversal, or a remand.

> 2.     Whether the ALJ Improperly Discredited the Testimony of the Plaintiff.

> a.     Standard of Review.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  Driggins v.

Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823 (8th Cir. 1996.  Factors which the ALJ must consider, in the evaluation of the

Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

>     1.    the claimant's daily activities;
>
>     2.    the duration, frequency, and intensity of the pain;
>
>     3.    precipitating and aggravating factors;
>
>     4.    dosage, effectiveness and side effects of medication;
>
> and
>
>     5.    functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them.  Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a

claimant's subjective complaints of pain).   It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual.   Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).   For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated."   O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974).   Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.   Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.   For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.   Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).   By the same

token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.  Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

b.  Legal Analysis.  In arriving at his RFC, the ALJ found the testimony of the ME to be wholly credible, while he discredited the testimony of the Plaintiff, insofar as his complaints were inconsistent with the Record as a whole. Guided by Polaski v. Heckler, and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, to be undermined by his medical records, and daily activities.  In particular, the ALJ noted that the Plaintiff initially reported that only his shoulder impairment precluded him from working, but that the

Plaintiff testified at the Hearing concerning numerous other physical and mental ailments that, allegedly, had kept him from working.  [T. 26].

In discounting the Plaintiff's testimony, the ALJ referenced specific medical evidence that related to the Plaintiff's complaints.  Specifically, the ALJ found the Plaintiff's complaints of knee pain were undermined by the fact that the only treatment sought, in order to address that pain, was conservative in nature -- ibuprofen, Tylenol, and a single steroid injection to the right knee.  After  considering the objective evidence, the opinions of the physicians, the lack of significant treatment, as well as the opinion of the ME, that the mild arthritis in the Plaintiff's knee would be accommodated by the ten (10) pound lifting restriction, [T. 25-26], the ALJ determined that a greater limitation would be unsupported in the Record.

The ALJ also noted the lack of objective evidence which corroborated the Plaintiff's complaints of disabling pain, other than as they arose from the Plaintiff's shoulder condition.  The ALJ determined that the Plaintiff had failed to provide evidence of an attempt to treat, or medicate, his "chainsaw"-like back pain, headaches, or degenerative disc disease at C6-7.  Furthermore, the ALJ noted that the Plaintiff's claims of total disability, because of his seizures and depression, were inconsistent

with the Record, as both conditions appeared to be adequately treated through the use of prescribed medications. [T. 27].

The ALJ also found that the Plaintiff's daily activities were inconsistent with the degree of impairment that he had asserted. The ALJ relied on the testimony which reflected that the Plaintiff retained his capacity to go to the library, read books, play cards, watch TV, and listen to music, which demonstrated that the Plaintiff was able to function at a level that was accommodated by the ALJ's RFC.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference," Sarna v. Barnhart, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). We find no basis to reverse the Plaintiff's credibility rulings, and we reject that challenge to the ALJ's determination.

3.   Whether the ALJ Propounded a Proper Hypothetical to the VE.

a.   Standard of Review. In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations he accepted, as supported by substantial evidence. See, Pertuis v. Apfel,

152 F.3d 1006, 1007 (8th Cir. 1998); <u>Rappoport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991).   Those facts in the hypothetical are designed to replicate the Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if there are any, which an individual, with functional limitations like those of the Plaintiff, would be able to perform.   See, <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1317 (8th Cir. 1991); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).

Moreover, it is well-settled that the testimony of a VE, which is based upon a properly-phrased hypothetical question, constitutes substantial evidence.   See, e.g., <u>Howard v. Massanari</u>, supra at 582; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1049 (8th Cir. 1999); <u>Porch v. Chater</u>, 115 F.3d 567, 571 (8th Cir. 1997).   In order to rely upon a VE's opinion, however, the hypothetical posed "must fully set forth a claimant's impairments."   <u>Sullins v. Shalala</u>, 25 F.3d 601, 604 (8th Cir. 1994), citing <u>Totz v. Sullivan</u>, 961 F.2d 727, 730 (8th Cir. 1992).

b.   <u>Legal Analysis</u>.   The Plaintiff contends that the ALJ's hypothetical was flawed, because he failed to require a sit/stand option in the question posed to the VE.   The Plaintiff further contends that the ALJ improperly failed to account for the Plaintiff's limited ability to complete a task, with adequate persistence and pace, and to account for the Plaintiff's difficulties with memory and recall.   The

Plaintiff maintains that, in the absence of those limitations, the hypothetical questions, which were posed to the VE, were incomplete.

The ALJ specifically found that the Plaintiff was severely impaired by recurrent right rotator cuff tear status post surgical repair, cervical radiculopathy, degenerative joint disease of the right knee, a seizure disorder, alcohol abuse, and depression, and these impairments were included in both the ALJ's RFC, and in the hypotheticals posed to the VE.  [T. 23, 294].  The VE responded that there were a significant number of jobs available in Minnesota, including 16,000 jobs as a benchworker, and 8,000 jobs as a hand packager, which would be consistent with those limitations.  [T. 295-96].  Furthermore, we have already determined that the ALJ thoroughly reviewed the Record, and properly discredited the Plaintiff's subjective complaints.  As we have noted, the ALJ need only include the limitations he accepted, as supported by substantial evidence.  See, Pertuis v. Apfel, supra at 1007; Rappoport v. Sullivan, supra at 1323.  Since we find that the complaints, which the Plaintiff seeks to include in the hypothetical, were not supported by substantial evidence on the Record as a

whole, those hypotheticals, and the VE's opinions, which were predicated thereon, were not in error.[6]

4.   The ALJ Failed to Properly Apply the Vocational Guidelines in Making a Finding of Disability.

Lastly, the Plaintiff asserts that the ALJ failed to apply the Vocational Guidelines in determining whether the Plaintiff was disabled.  The Plaintiff contends that the testimony, which was adduced at the Hearing by the ME, supports a physical exertional limitation to "sedentary work."  [T. 291].  The Plaintiff urges that, given a sedentary exertional limitation, the Vocational Grids mandate a finding of "disabled."   However, as clarified later at the Hearing, the ME expressly testified that the Plaintiff should be limited to the "sedentary" exertional level solely for the purposes of lifting, but would not require any limitation as to the amount of time that the Plaintiff could spend on his feet.  [T. 294. 300].  The ALJ acknowledged, in his decision, that the Plaintiff's exertional level, as contained in the RFC, was neither truly "sedentary,"

---

[6]An ALJ may rely on a VE's testimony when it was elicited in response to a hypothetical question that accurately describes all of claimant's impairments that were supported by substantial evidence.  See, Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985); Andres v. Bowen, 870 F.2d 453, 455 (8th Cir. 1989).

or "light," but instead, was a hybrid exertional level in which the Plaintiff had no limitations as to walking, but had only a sedentary level with respect to his ability to lift and carry. [T. 28-29]. The ALJ based this determination on the testimony of the ME, as supported by the medical evidence in the Record. [T. 25]. Therefore, the ALJ determined that the Plaintiff's RFC did not fit neatly into either a "sedentary," or "light" level of limitation.

The ALJ expressly acknowledged that, under the vocational grid rule in Appendix 2, Subpart P, of the Regulations, the level of exertional restriction would determine the ultimate outcome of the Plaintiff's disability decision, and stated that "an individual with the [Plaintiff's] vocational profile and limitation to sedentary work would be considered 'disabled' under the vocational grid rules; however, a conclusion of 'not disabled' would be directed if the residual functional capacity were for light work." [T. 28].

As noted by the ALJ, Social Security Ruling ("SSR") 83-12 provides guidance "when a claimant's exertional level falls between two grid rules which direct opposite conclusions, i.e., 'not disabled' at the high exertional level and 'disabled' at the lower exertional level.'" [T. 28-29]; see, "Titles II and XVI: Capability to do Other Work -- the Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations

Within a Range of Work or Between Ranges of Work." SSR 83-12, 1983 WL 31253

(1983). SSR 83-12 addresses instances in which no specific Rule, from Appendix 2,

Subpart P of the Regulations, is applicable, because the individual's RFC "does not

coincide with any one of the defined exertional ranges of work." SSR 83-12, supra

at *1. The Regulation provides that, where such is the case, "the occupational base

is affected and may or may not represent a significant number of jobs in terms of the

rules directing a conclusion as to disability." Id. at *2. The ALJ is then to "consider

the extent of any erosion of the occupational base and access [sic] its significance"

and, "[w]here the extent of erosion of the occupational base is not clear, the

adjudicator will need to consult a vocational resource." Id. SSR 83-12 goes on to

provide guidance in certain situations, including, in pertinent part, the following:

> 2.     If the exertional level falls between two rules which
> direct opposite conclusions, i.e., "Not disabled" at the
> higher exertional level and "Disabled" at the lower exertional
> level, consider as follows:
>
> a.     An exertional capacity that is only slightly
> reduced in terms of the regulatory criteria could indicate a
> sufficient remaining occupational base to satisfy the minimal
> requirements for a finding of "Not disabled."
>
> b.     On the other hand, if the exertional capacity is
> significantly reduced in terms of the regulatory definition, it

could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."

       c.    In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability.    Accordingly, [vocational specialist ("VS")] assistance is advisable for these types of cases.

      3.    Another situation where VS assistance is advisable is where an individual's exertional RFC does not coincide with the full range of sedentary work.  In such cases, equally difficult judgments are involved. * * * A VS can assess the effect of any limitation on the range of work at issue (e.g., the potential occupational base); advise whether the impaired person's RFC permits him or her to perform sub-stantial numbers of occupations within the range of work at issue; identify jobs which are within the RFC, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country.

Id. at 2-3.

The ALJ found that the Plaintiff was a person closely approaching advanced age, with a high school education, and no transferable skills. [T. 30]. Given that profile, if the Plaintiff were able to perform the full range of sedentary work, he would be found "disabled" but, if he were able to perform the full range of light work, she would be found "not disabled." [T. 28]. However, the Plaintiff's RFC, as determined by the

ALJ, allowed less than the full range of light work, in part because of the limitations on the amount of weight which the Plaintiff could lift and carry, but also more than the full range of sedentary work, because he was not limited in his ability to sit, stand, and/or walk in any combination, for eight hours per work day, with no time limits as to the time spent on his feet.  [T. 29].  Thus, the application of SSR 83-12(2)(c) was particularly appropriate in this circumstance, as was the ALJ's reliance on the opinion testimony of the VE.

The Plaintiff argues that the ALJ should have used the Grids.  The Plaintiff further contends that, in comparison to the total number of light job positions in the State of Minnesota, the number of jobs available to the Plaintiff, given his RFC, represented a significant erosion of the job base.  Finally, the Plaintiff interprets the Grids to mean that, when an individual, who has the Plaintiff's characteristics, was only capable of performing sedentary work, the finding of "disabled," which is directed by the Grids, is equivalent to a finding that the job base had been significantly eroded.

Where an individual's RFC does not match the Grids, a VE should be used instead.  See, Walker v. Apfel, 197 F.3d 956, 958 (8th Cir. 1999) ("Because the ALJ relied on VE testimony regarding Walker's particular limitations, he did not need to

rely on the grid."); Mackinaw v. Bowen, 866 F.2d 1023, 1024 (8th Cir. 1989)(holding that where the  claimant's relevant characteristics differed from those contemplated by the Grids, the Commissioner must, instead, rely on the VE testimony); Fedje v. Barnhart, 2002 WL 537648 at *6 (D. Minn., April 9, 2002)("Because the ALJ found Plaintiff's [RFC] to be between light work and sedentary work, the [Grids] can not be used to direct whether Plaintiff is disabled."), aff'd, 319 F.3d 1048 (8th Cir. 2003), citing Heckler v. Campbell, 461 U.S. 458 (1983), and Haynes v. Heckler, 716 F.2d 483, 485 (8th Cir. 1983)(where the Grids did not encompass the claimant's disability, the ALJ committed erred by relying on them, rather than on vocational testimony); see also, Wilkerson v. Apfel, 230 F.3d 1365, 2000 WL 1429602 at *1 (8th Cir., September 28, 2000)[Table Decision], citing Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir. 1998) (where a claimant's characteristics do not match the Grids, because he or she is unable to perform the full range of a particular work classification, the ALJ must produce VE testimony).  Therefore, the ALJ correctly employed a VE to testify at the Hearing, here, rather than relying on the Grids.

In his questioning of the VE, the ALJ incorporated the restrictions, as contained in the RFC, which included the ability to occasionally lift up to ten (10) pounds, without any limitation as to time spent on his feet.  [T. 29, 294-300].  Based upon

those restrictions, the VE testified that there were 16,000 benchworking positions, reduced from 39,000; and 8,000 packaging positions at the light work level, reduced from 16,000, in the State of Minnesota.  [T. 296].  The ALJ also had incorporated mental restrictions into his hypothetical, that limited the Plaintiff to three or four step tasks.  <u>Id.</u>  The VE testified that those restrictions would not affect the enumerated jobs, nor would the limitations in the RFC.  <u>Id.</u>

In his decision, the ALJ summarized the VE's testimony, as follows:

> The [ALJ] has appropriately sought the expert opinion of the [VE], who testified that there are thousands of benchwork and hand packaging jobs that an individual with the [Plaintiff's] vocational profile and [RFC] can perform. Based on the credible and persuasive testimony of the [VE], the [ALJ] concludes that there are a significant number of other jobs existing in the national economy that the [Plaintiff] can perform.

[T. 29].

Therefore, we conclude that the ALJ properly questioned the VE, as to all of the Plaintiff's restrictions, which were supported by the Record as a whole, and that the VE testified as to how those particular restrictions would affect the Plaintiff's available job base.  The ALJ's approach is consistent with SSR 83-12, which states that, "[w]here the extent of erosion of the occupational base is not clear, the adjudicator will

need to consult a vocational resource."  See, <u>Carter v. Sullivan</u>, 909 F.2d 1201, 1202 (8th Cir. 1990).

Although it is true that the ALJ never used the precise phrase "erosion of the occupational base," in either his questioning of the VE, or in his decision, he need not do so, particularly where he consults a VE, and the VE considers the individual's specific limitations to identify the kinds and numbers of jobs available.  See, <u>Fedje v. Barnhart</u>, supra at *6; <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1220 (8th Cir. 2001); <u>Haines v. Apfel</u>, 986 F. Supp. 1212, 1215 (S.D. Iowa 1997), citing <u>Ness v. Sullivan</u>, 904 F.2d 432, 436 (8th Cir. 1990)("[W]here referral to the [Grids] is inappropriate, the ALJ must rely on the testimony of a [VE] in response to a hypo-thetical question which precisely sets out the claimant's impairments and limitations.").  Indeed, cases from other Circuits confirm our conclusion.  See, <u>Boone v. Barnhart</u>, 353 F.3d 203, 210 (3rd Cir. 2003)("[W]e shall not interpret SSR 83-12 to mandate reversal whenever the ALJ does not set out specific findings if, as here, the ALJ has received the assistance of a VE in considering the more precise question whether there are a significant number of jobs in the economy that the claimant can perform."); see also, <u>Casey v. Barnhart</u>, 76 Fed. Appx. 908, 911, 2003 WL 22230115 at *2 (10th Cir., September 29, 2003)("The ALJ fulfilled his obligation to determine [the claimant's]

occupational base by consulting a VE to determine whether a person with the claimant's profile could perform substantial gainful work in the economy."); <u>Davis v. Social Security Administration</u>, 36 Fed. Appx. 289, 290, 2002 WL 1160923 at *1 (9th Cir., May 31, 2002)("[SSR] 83-12 does not compel the conclusion that he is disabled because of the erosion of his occupational base," for "[a]ll that was required of the ALJ was that he consult with a [VE] to determine whether [the claimant] could perform substantial gainful work in the economy."); <u>Barstad v. Chater</u>, 76 F.3d 384, 1996 WL 29255 at *2 (9th Cir., January 25, 1996)[Table Decision](rejecting the claimant's argument that "the ALJ should have specifically determined whether the reduction in the range of light work available to him so eroded his occupational base that his exertional level should be defined as sedentary.").

Finally, we agree with the ALJ that the 16,000 to 24,000 jobs, which were available to the Plaintiff in view of his RFC, satisfies the Commissioner's burden of proof by establishing that there were a significant number of jobs in the national economy that he could perform. See, <u>Hall v. Chater</u>, 109 F.3d 1255, 1259 (8th Cir. 1997) (340 jobs in State is a significant number of jobs); <u>Jenkins v. Bowen</u>, 861 F.2d 1083, 1087 (8th Cir. 1988)(500 jobs in region is a significant number of jobs).  Thus, the ALJ's finding, that the Plaintiff was not disabled because he was capable of

performing a significant number of jobs in the relevant economy, is supported by

substantial evidence in the Record.  Therefore, finding no error in this, or in any other

aspect of the Commissioner's decision, we recommend that the Defendant's Motion

for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 16] for Summary Judgment be

denied.

2.      That the Defendant's Motion [Docket No. 23] for Summary Judgment

be granted.

Dated:  January 19, 2006          s/Raymond L. Erickson

                                  Raymond L. Erickson
                                  CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties by no later than

**February 6, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 6, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.